JOHN H. ALEXANDER and PHILIP T. TYSON, *vs.* HENRY WEBSTER and JOS. J. SPEED, Adm'rs of PATRICK MACAULEY.

By a written contract, the plaintiffs sold to the defendant one-fifth of a tract of land for $4000, of which $1500 was to be paid on a certain day, and the remaining $2500 so soon as the vendee should sell or otherwise dispose of his said interest in the land; and it was further agreed, that if the land should be subscribed as capital stock in a certain incorporated mining company, such subscription should be considered a sale, and the $2500 "shall be paid by a transfer of stock to the amount of the *par value of said sum.*" This land, with others, was so subscribed in January 1837, and on the 4th of March 1837, the company was organised and more than five hundred shares of the stock were assigned to the defendant, as representing his interest in said land. HELD:

1st. That the words "*par value*" refer, not to the stock, but to the sum of $2500, and in the connection in which they are used, are superfluous and useless.

2nd. That this contract gave to the defendant, the vendee, the privilege to pay the said $2500 in stock, at its nominal or par value.

3rd. The vendee, if he intended to pay in stock, was bound to make the transfer within a reasonable time after the 4th of March 1837, and without request on the part of the vendors; and failing to do so, the latter were not bound to receive the stock, but had a right to demand payment in money equivalent to the *actual value* of the stock at the time it should have been transferred.

The vendors demanded payment of the $2500 in January 1846, and the vendee transferred to them *twenty-five shares of stock at its par value of $100 per share*, but the stock was worth in the market but $5 per share. This the vendors refused to accept, insisting that the vendee was bound to pay them $2500 in money, or stock of that value in the market. HELD:

That this refusal, for the reasons assigned and the tender of the stock then made, did not defeat the vendor's right of action, because the reasons assigned for the refusal was a clear denial that this tender was a compliance with the contract by the vendor.

When an objection to a tender is to operate as a waiver, it cannot be a waiver of anything which is clearly within the objection, if true, and if the objection is true in part only, it will not make the tender good; provided the part which is true shows the tender is defective, and not a compliance with the obligation resting on the party making it.

The judgment of a court below, coming up by appeal, is *prima facie* correct, and the party asking for its reversal must *show* that it is erroneous.

CROSS-APPEALS from the Superior Court of Baltimore city.

*Assumpsit* by Alexander and Tyson against Webster and Speed, as administrators of Macauley, to recover damages for the non performance of the following contract, entered into between the said plaintiffs on the one part and the said Macauley on the other, dated the 26th of July 1836:

"It is hereby agreed and admitted, that John H. Alexander and Philip T. Tyson have bargained and sold unto Patrick Macauley one undivided fifth part of the tract of land called "*Commonwealth,*" for the sum of $4000, current money, to be paid in manner following, to wit: The sum of $1500, with interest from the 26th day of March last, to be paid on or before the 8th day of September next, and the remaining -$2500 to be paid so soon as the said Macauley shall sell or otherwise dispose of his aforesaid interest in said land, provided the same at that time shall be worth $4000; and if the

said interest in said land shall not sell for or be worth the sum of $4000, then the said Macauley shall be bound to pay only so much as shall be equal to the difference between the sum of $1500 and the proceeds of sale or value of said land, the design of the parties hereto being, that the payment to be made by the said Macauley, other than the first payment of $1500, shall be made out of the profits of his adventure; and it is further understood, that if the said land called "*Commonwealth*" shall be subscribed as capital stock in the Georges Creek Coal and Iron Company, according to the provisions of the act incorporating the Georges Creek Mining Company, and the supplement thereto, such subscription shall be considered as a sale, and the valuation made thereof by the commissioners shall be considered as the value of said land, and the contingent payment of $2500 shall be paid by a transfer of stock to the amount of the par value of said sum."

The case was submitted to the court below upon an agreed statement of facts, in substance as follows: "Commonwealth" contained about three thousand, eight hundred and seventeen acres, and with another tract called "Beatty's Plains," containing about seven thousand acres, of which Macauley owned one-half and the plaintiffs the other, was appraised by commissioners appointed pursuant to the act referred to in the above agreement, and Macauley's one-fifth thereof was appraised by them at about $50,000. Subsequently on the 10th of January 1837, the two tracts were subscribed as capital stock of the Georges Creek Coal and Iron Company, and on the 4th of March following, at the first meeting held for the purpose of organising said corporation, the plaintiff, Alexander, transferred to Macauley two thousand, seven hundred and twenty-eight shares of the capital stock of said company, as representing his interest in the two tracts, and at the same time the then stockholders subscribed for an additional quantity of $30,000 worth of said stock. On the 20th of January 1846, the plaintiffs, for the first time, demanded of Macauley payment of the second instalment mentioned in said agreement, and he then offered and did transfer to their names

46    v. 6

twenty-five shares of the said stock, intending said transfer to be a compliance with said demand and in full satisfaction of his part of said agreement, but the plaintiffs denying that they had by said agreement ever agreed to take stock in payment of said instalment, except at its current or market value, refused to accept said twenty-five shares in full of their demand, and insisted that Macauley was bound, as he had always been by said agreement, to pay the said $2500 in ready money, or in as many shares of said stock as would produce said sum if sold in the market. At this time the stock was worth in the market about $5 per share, the nominal or par value being $100 per share. During the month of March 1838, there were sold in England four thousand shares of the stock of this company at $80 per share. It was admitted that the stock has never been a current stock in the market at Baltimore or elsewhere; that it has been chiefly held by the original owners, who sold some of it at private sale, at various times between the 4th of March 1837 and the 1st of July 1838, at $20 and $25 per share, and in July 1838, fifty shares were sold in London at private sale at $82 per share. The plaintiffs purchased the two tracts of land in 1835 and 1836, and paid $1.25 per acre for "Commonwealth" and $2.12½ per acre for "Beatty's Plains." It was further admitted, that Macauley fully paid the first instalment of $1500, and had at all times during his life, from the date of the transfer of said two thousand, seven hundred and twenty-eight shares to the 26th of January 1846, standing in his name more than twenty-five shares of said stock, and that his administrators are now and have always been willing to execute any paper or do any act necessary more effectually to secure said twenty-five shares to the plaintiffs, if it can be done.

Upon this statement of facts the plaintiffs claimed $2500, with interest from the 10th of January 1837, and the defendants denied that any thing was due them, and either party was to have the right of appeal. The court, (FRICK, J.,) gave judgment for the plaintiffs, and assessed the damages at $1054.69, with costs, from which both parties appealed.

The cause was argued before LE GRAND, C. J., ECCLE-STON and TUCK, J.

*Thomas S. Alexander* for the plaintiffs below, argued:

1st. That by the true construction of the contract in this case, the second instalment became payable immediately after the transfer of stock to Macauley and the organization of the company on the 4th of March 1837. On that day stock sufficient to make the payment was transferred to him, and therefore Macauley had the option to pay in money or stock, and having failed to pay in stock he became liable to pay the instalment in money, and the plaintiffs were therefore entitled to recover the sum of $2500, with interest from the 4th of March 1837.

2nd. But conceding that by the agreement he was bound simply to pay in stock, and that he was in default by reason of his failure so to pay on the 4th of March 1837, the question then is, what is the measure of damages? The agreement is not that the payment should be made in stock at its par value, but it says the "$2500 shall be paid by a transfer of stock *to the amount of the par value of said sum.*" The ex-pression *par* is by the agreement associated with the sum to be paid, and not with the value of the stock; it is equivalent to *principal.* We say therefore that the measure of damages, as assessed by the agreement itself, is $2500 in money, or stock which will bring in the market that sum, and on this point see 5 *Wend.*, 393, *Pinney vs. Gleason.* 2 *Penn. Rep.*, 63, *Roberts vs. Beatty.* 3 *Conn.*, 58, *Brooks vs. Hubbard.* 12 *Verm.*, 509, *Harrington vs. Wells.* 1 *Halsted*, 464, *Grieve vs. Annin.* 1 *Wash. C. C. Rep.*, 376. 6 *H. & J.*, 273, *Lyles vs. Lyles.* *Ibid.*, 301, *Cannell vs. M'Clean.* If Macauley had sold the land for money he would have been compelled to pay the $2500 in money. The subscription of the land as stock was made on the 10th of January 1837, and this the agree-ment says shall be regarded as a sale, and the valuation of the commissioners be considered the valuation of the land. But suppose he was bound to pay in stock at its *market* value

only on the 4th of March 1837, when, according to our construction of the agreement, he was bound to pay, what was then the value of the stock?   The presumption is that it was *at par;* the stockholders at that time paid $100 per share for it, and *afterwards* a large sale was made in England at $80 per share.   There is no proof or admission from which it can be assumed that the stock was on that day worth less than its par value.

3rd. We deny that a request on the part of the plaintiffs was necessary to put Macauley in default, but if he had time to make the transfer until hastened by request, we then insist that he was obliged to transfer so much stock as on the day of demand, to wit, in January 1846, would have produced in the market the par or principal sum of $2500.   The transfer on that day of twenty-five shares at its par value was no performance of the agreement, for the breach was in March 1837. But this performance *after breach* is sought to be made available to defeat the plaintiffs' right of action on account of the *reasons* assigned for the refusal to *receive the stock;* it is said this constitutes a waiver of their right to require the payment in money.   But the case of *Gould vs. Banks*, 8 *Wend.*, 562, cited to sustain this position, is *not law*, and is not sustained by the cases cited in it.   These cases only go to the extent of saying, that if an objection is not made which could have been obviated if disclosed at the time of tender, shall not afterwards be relied on, and the ground is that such objections are made in *bad faith;* for example, where a tender is made in bank notes which is not objected to on that ground, the creditor will not be allowed afterwards to object at the trial that the tender was not made in gold and silver, because had it been made at the time the debtor could have removed it by changing his notes for specie.   But such is not the present case, for here the objection goes to the whole case, the construction of the agreement, and is valid and substantial; the very objection is that Macauley was bound to pay $2500 *in money.*

*Henry Webster* and *Grafton L. Dulany* for the defendants below, argued:

1st. That according to the true construction of the agreement, the second instalment was to be paid by Macauley in stock at its *nominal value;* he had no option to pay it in money. The terms of the agreement are, that in case a subscription of the land is made to this stock the $2500 "*shall be paid by a transfer of stock.*" Suppose the stock had been worth $200 per share, would not the plaintiffs have claimed it under this contract? In the expression "*par* value of said sum," as used in this agreement, the word "*par,* cannot qualify or apply to a sum of money, for money is that which has a fixed and certain value, and is the standard by which the value of all other property is determined. It is never said that *money* is at *par,* for this is nonsense, but to say that stock is at its *par value* is the common language of business men, and to the stock, therefore, the word must be applied in this case. It would make nonsense to apply it to any thing else, and the whole spirit of the agreement contemplates such an application.

2nd. But we say the plaintiffs have no cause of action whatsoever against us, because Macauley performed all that the contract imposed upon him. He discharged this obligation on the 4th of March 1837, for he then assented with others in interest that the entire tract called "*Commonwealth*" should be conveyed to the Georges Creek Coal and Iron Company, and the whole stock of said company for said land should be issued by Alexander, one of the plaintiffs, acting for himself and the other. By this proceeding the *legal* title to this stock was vested in the plaintiffs, together with the *equitable* interest also, to the extent of as many shares as they were entitled to in their own right under this agreement with Macauley. By this means they took the absolute, legal and *equitable* interest in this stock; this was a transfer to them by Macauley of his *equitable* interest in the land and stock. By this arrangement therefore, he did indirectly that which he was bound to do directly, and where one promises to do a

thing and does a thing equivalent to it, or where the thing is done by operation of law, it is in law a performance. *Worthington on Wills*, 89, 90, in 60 *Law Lib.*, 48. 2 *Ves., Jr.*, 463, *Richardson vs. Elphinstone.* 3 *Do.*, 516, *Hinchcliffe vs. Hinchcliffe.* 13 *Wend.*, 95, *Lamb vs. Lathrop.* 1 *Peere Wms.*, 324, *Blandy vs. Widmore.*

3rd. But if we are wrong in the preceding proposition, we then insist that as no day is fixed by the contract for the payment or transfer of the stock by Macauley, he had his whole lifetime in which to make the transfer, unless quickened by the request of the plaintiffs, and consequently his transfer on the 10th of January 1846 was a valid fulfilment and discharge of his contract, though refused by the plaintiffs. *Coke Litt.*, 208, *b.* By the terms of the contract he was not bound himself to make the transfer.

4th. But the tender of the stock made by Macauley on the 20th of January 1846, in reply to the plaintiffs' demand, and the refusal to accept by the plaintiffs for the *reasons* assigned by them, it not being an absolute refusal, amounted to a waiver of their right to require payment in money, and the transfer then made defeated any right of action by them. 8 *Wend.*, 567, *Gould vs. Banks.* 3 *Term Rep.*, 554, *Wright vs. Reed.* 2 *Bos. & Pul.*, 526, *Grigby vs. Oakes.* 6 *Bac. Abr.*, 470. 1 *Peter's C. C. Rep.*, 15, *Blight vs. Ashley.*

5th. But if Macauley violated his agreement by not making the transfer of the stock on the 4th of March 1837, then we insist that the measure of damages is the value of twenty-five shares of stock in the market on that day. *Story on Cont.*, secs. 341, 344. 3 *Cranch*, 298, *Douglas vs. McAllister.* 6 *Wheat.*, 109, *Hopkins vs. Lee.* 8 *Pet.*, 181, *Robinson vs. Noble.* 2 *Taunt.*, 257. 6 *H. & J.*, 297, *Cannell vs. M'Clean.* 1 *H. & G.*, 464, *Williamson vs. Dillon.* 4 *Md. Rep.*, 508, *Marshall vs. Haney.* Now according to the proof the actual market value of the stock on that day did not exceed the sum of $5 per share. It in fact had no market value then; the only sale made in the city of Baltimore was in 1838, but this furnishes no test of its value in 1837, when the contract was

to be performed. The land was bought for $1.25 per acre, and there is no evidence that the stock was worth more than the value of the land subscribed, and we say therefore that the court must take this value to be the value of the stock, and consequently the measure of damages.

ECCLESTON, J., delivered the opinion of this court.

In these cross-appeals, the plaintiffs below, (Alexander and Tyson,) insist, that the judgment should be reversed, because it does not give them a sufficient amount of damages. The defendants say the judgment ought to have been in their favor, and if they are wrong in this, that the damages allowed are too much.

One of the most difficult questions to be settled is, what is the meaning of this strangely worded contract, for it certainly is a most singular one in its terms. A portion of it is sufficiently plain to show, that on the 26th of July 1836, the plaintiffs agreed to sell to Patrick Macauley, the defendants' intestate, one undivided fifth part of the tract of land called "Commonwealth," for the sum of $4000. Of this sum, $1500, with interest from the 26th of March previous, was to be paid on or before the 8th day of September ensuing. The remaining $2500 to be paid so soon as he, (Macauley,) should sell or otherwise dispose of his aforesaid interest in the land, provided the same should at that time be worth $4000. And if his interest in the land should not sell for or be worth that sum, then he should be bound to pay only so much as should be equal to the difference between the sum of $1500 and the proceeds of sale or value of the land. The design of the parties, as stated in the contract, being, that the payment to be made by Macauley other than the first payment of $1500 should be made out of the profits of his adventure. Then follows the provision which has given rise to this controversy. The language is: "And it is further understood, that if the said land called "Commonwealth" shall be subscribed as capital stock in the Georges Creek Coal and Iron Company, according to the provisions of the act incorporating the Georges Creek Mining Company and the supplement thereto, such

subscription shall be considered as a sale and the valuation made thereof by the commissioners shall be considered as the value of said land, and the contingent payment of twenty-five hundred dollars shall be paid by a transfer of stock to the amount of the par value of said sum."

It has been made a question in argument, whether the words "par value" are to be considered as having reference to the stock to be transferred or to the sum of twenty-five hundred dollars. Although they are strange words to be used in connection with a sum of money, whilst they are quite common and very appropriate in regard to stock, yet their position in this sentence is such, that we cannot consider them as having reference to the stock, but to the sum of twenty-five hundred dollars. And taking them in this connection, they are superfluous and useless, because the par value of a given sum of money is nothing more or less than the sum itself.

Notwithstanding these words, by the express terms of the contract, cannot be considered as applicable to the stock, still we think that instrument is to be understood as imposing upon Macauley the obligation, or rather giving him the privilege, to pay the balance due from him in stock, at its nominal or par value.

In *Robinson vs. Noble's Adm'rs*, 8 *Pet. S. C. Rep.*, 181, payment was to be made, one-half in specie and the other half, in Cincinnatti, in the paper of banks current therein. A memorandum at the foot of the argument says: "It is understood, that the payment to be made in Cincinnati is to be in the paper of the Miami Exporting Company or its equivalent." When the payment should have been made, the notes of that company were worth, in specie, not more than sixty-six and two-thirds per cent. It was contended, that as the payment had not been made in notes at the time agreed upon, the plaintiff had a right to demand satisfaction in specie, and to the full amount of the sum agreed to be paid in the depreciated paper. But the Supreme Court say: "In what does this covenant to pay differ from an agreement to deliver a certain quantity of flour, or any other commodity, on a given day?" They speak of the damage which resulted from the non-pay-

ment as certainly being no more than the value of the notes if they had been paid, and then say: "Had these notes been equal to specie on the day of payment, Robinson was bound to pay them or what was of equal value. If they had depreciated to fifty cents in the dollar, Noble was bound to receive them in discharge of the covenant." And as Robinson could only be liable to make good the damages resulting from his default, the specie value of the notes, at the time they should have been paid, was held to be the rule by which such damages were to be estimated. That case is so much like this in principle, that we do not see why the rule there adopted should not apply here.

In *Hopkins vs. Lee*, 6 *Wheat. Rep.*, 118, it is stated to be a settled rule in the Supreme Court, that where a vendee is sued for breach of contract for not delivering the article, its value or price at the time of the breach is the measure of the damages. And the court say: "The price being settled by the contract, which is generally the case, makes no difference, nor ought it to make any."

In *Cannell vs. M'Clean*, 6 *H. & J.*, 297, the real value of the land at the time the conveyance should have been made was held to be the amount of damages which the plaintiff was entitled to, notwithstanding the price of the land was mentioned in the bond of conveyance. See, also, *Marshall vs. Haney*, 4 *Md. Rep.*, 508.

The decisions in regard to contracts similar to the present have not been uniform. Some have held, that when the period has passed at which the payment in property might be made but has not, the party entitled to receive has a right to claim payment in money, and the sum mentioned in the agreement, with interest, is the amount to be paid. But thinking the cases in the Supreme Court, which have been mentioned, are more consistent with correct legal principles, and are also in unison with our own decisions, which have been cited, so far as they have any bearing on the subject, we deem it proper to adopt the ruling of the Supreme Court.

It has been said in defence, that Macauley was not bound to transfer the stock until the plaintiffs demanded it of him. But we do not think so. The transfer was to be a substitute for

47    v.6

the payment of the twenty-five hundred dollars, which was to have been made so soon as Macauley effected a sale of the land. If the land should be subscribed as stock, the subscription was to be considered as a sale. If, instead of converting the land into stock, it had been sold for four thousand dollars or upwards, Macauley would have been bound to pay the twenty-five hundred dollars; and had he failed to do so, the plaintiffs might have sued him for a breach of the contract, without having demanded payment. If so, as the transfer of stock was only substituting another mode of payment, no demand of the transfer was necessary. In *Thomas vs. Roosa*, 7 *Johns. Rep.*, 461, the second count in the *nar* was upon a note, in which the defendant promised to pay the plaintiff "in a good horse, to be worth, with saddle and bridle, eighty dollars, and goods out of the store, amounting to twenty dollars." The court held that a request was not required to be specially averred and proved, and that a request was not parcel of the contract. See, also, *Chitty on Cont.*, 629, *(Ed. of 1851.)* *Shrewsberry vs. Buckleys*, 4 *Bibb.*, 260. *Townsend vs. Wells*, 3 *Day*, 331. 1 *Saund. Rep.*, 33, *a*, 33, *b*. *Wallis vs. Scott*, 1 *Strange.*, 88. *Radford vs. Smith*, 3 *Mees. & Wels.*, 258. 1 *Saund. on Pl. & Ev.*, 130, *(Ed. of 1829.)*

On the 20th of January 1846, the plaintiffs called on Macauley for payment of the $2500. The latter answered this requisition by transferring into their names twenty-five shares of stock, which, at par, amounted to $2500, but were worth, at that time, in the market, no more than $5 per share. The plaintiffs refused to accept this stock, insisting that Macauley was bound to pay them $2500 in money, or stock of that value in the market at the time of transfer.

It has been contended, that this transfer or tender of stock by Macauley and the refusal to accept it for the reasons stated, will defeat the plaintiffs' right to recover in this suit. To this we cannot yield our assent.

We have seen that the transfer of stock was intended as a substitute for the contingent payment of $2500, which payment was to have been made so soon as the land should be

sold; and the agreement stipulates, that the land being subscribed as capital stock, should be considered as a sale; of course, the transfer was required to be made within a reasonable time after such subscription, no particular day being named by the contract either for the payment in money or in stock. The subscription was made in January 1837. And on the 4th of March 1837, at the first meeting held for the purpose of organizing the company, Alexander transferred to his associates capital stock proportioned to the value of their respective interests in the lands subscribed. Macauley's interest in the tract called "Commonwealth" was valued at more than $50,000, and for this he received upwards of five hundred shares of capital stock, of the par value of $100 per share. Upon the receipt of this stock he was in a condition to make the transfer to the plaintiffs, and was bound to do so if he intended to pay them in stock. But failing to make the transfer within a reasonable time, the plaintiffs were not bound to receive payment in stock, and had a right to insist upon compensation in money, equivalent to the actual value of the stock at the time when it should have been transferred.

The defendants, however, contend, that the tender of stock which was made by Macauley on the 20th of January 1846, and the refusal to accept by the plaintiffs for the reasons assigned, amounted to a waiver of their right to require payment in money, and that the transfer then made defeated any right of action on the part of the plaintiffs. The case of *Gould vs. Banks*, 8 *Wend.*, 562, is relied upon to sustain this position, but we do not perceive that it does. The defendant was under a contract to deliver to the plaintiff six hundred and twenty-five copies of the 8th volume of Johnson's Reports, as soon as the same should be out of press and ready for delivery. After this edition of the book was printed the plaintiff demanded the six hundred and twenty-five copies, but the defendant refused to deliver them. Within six months after the publication the copies were tendered to the plaintiff, who refused to receive them because they were *unmerchantable.* At the trial the plaintiff made an effort to prove that the copies

tendered were unmerchantable, but this evidence being ob-
jected to was, held to be inadmissible under the pleadings.
Upon motion of the defendant the plaintiff was nonsuited, the
judge being of opinion that the tender of the six hundred and
twenty-five copies was a bar to a recovery on the contract in
relation thereto.   When the case came before the Supreme
Court, upon a motion to set aside the nonsuit and for a new
trial, it was decided that the refusal by the defendant to deliver
when the demand was made upon him, gave to the plaintiff a
right to compensation in damages, to the extent of his loss, and
the subsequent offer to deliver could not bar the recovery, if
the plaintiff insisted upon his right, even if no suit had been
commenced by him.   The commencement of the suit was not,
what prevented the subsequent fulfilment of the contract by
the defendant, but his previous default, and the plaintiff's
right of action consequent upon that default.   And Judge
Nelson, in delivering the opinion of the court, says: "It is,
however, competent for the party to waive this right of action
and accept a performance of the contract, and I think the
plaintiff did so at the time of the tender of the six hundred
and twenty-five volumes.   He then put his refusal to accept
the same, not upon the former default or lapse of time, but
solely upon the ground that the books were unmerchantable."
This was considered to be a waiver of all other objections to
the tender, and if he was mistaken in the one urged, the
tender was good, and a bar to the suit.

But it appears that the decision of the judge below, in
rejecting the evidence as to the unmerchantable character of
the books, was overruled.   In relation to this subject Judge
Nelson says: "It cannot be necessary to enter into an argu-
ment or cite authorities to show that if the books were unmer-
chantable, either as to material or execution, the tender would
be defective, and no legal performance of the agreement."
And in conclusion he adds: "The judge erred in excluding
testimony that the 8th volume was not printed in a merchant-
able or workmanlike manner, in answer to the evidence of
tender."

Alexander and Tyson, *vs.* Macauley's Adm'rs.

If this decision is to be taken as authority, (which is neither affirmed or denied,) it shows that although the plaintiff's mode of refusing to accept the tender might operate as a waiver of his prior right of action for the original breach of the contract, yet it could only do so provided the books were not unmerchantable. In other words, the waiver would avail the defendant nothing provided his tender was subject to the objection urged against it by the plaintiff. And he having made none other must be confined to that alone, because relying upon that, *expressly*, justified the inference of his intention to abandon all others. When an objection to a tender is to operate as a waiver, it cannot be a waiver of any thing which is clearly within the objection, if true. And if the objection to its full extent may not be true, but is so in part, yet it cannot be a waiver which will make the tender good, provided that portion of the objection which is true shows that the tender is defective, and not a compliance with the obligation resting upon the party when he makes the tender, otherwise an inference would be permitted inconsistent with the negation of the objection itself. Whatever the objection denies, surely cannot be considered as admitted or waived.

In our opinion, when Macauley was called upon in January 1846, the plaintiffs had a right to demand of him, in money, a sum equivalent to the real value of twenty-five shares of stock in March 1837. Instead of paying such a sum Macauley tendered to them twenty-five shares of stock, which, according to the proof, was worth at the time of the tender only $5 per share, or $125 in the whole, this being, in our estimation, considerably less than the actual value of the stock in March 1837. The plaintiffs refused to accept, and insisted that Macauley was bound to pay them $2500 in money, or stock of that value in the market. Admitting the reason thus assigned for refusing was a waiver of the right to demand money, and conceded that payment might be made by Macauley in stock, was it not a clear denial that the tender of twenty-five shares was a compliance with, or fulfilment of, the obli-

gation then resting upon him under the contract? It would be a strange constructive waiver to say that because the plaintiffs refused to accept the offer, and claimed more than they were entitled to by law, they waived what they had a right to demand, and, consequently, were bound to take the stock tendered, or could get nothing. If, in the case of the Johnson's Reports, the plaintiff might prove the books were unmerchantable, and if he could succeed in doing so, the tender would be no bar to the action, why may not these plaintiffs avail themselves of the proof here, which shows the tender to be less than they had a right to demand, especially as they refused to accept the tender on account of its insufficiency in amount?

Considering, as we do, the actual, and not the nominal, value of twenty-five shares of stock in March 1837, with interest, to be the amount in damages which the plaintiffs are entitled to claim, it remains to be ascertained what that amount is. And upon this subject we feel great difficulty in coming to any satisfactory conclusion, for the want of sufficient *data* on which to form a correct judgment. The court below allowed the sum of $1054.69. The plaintiffs ask for a reversal because that sum is too small. Before we can reverse on their appeal for such a reason they must satisfy us, by the proof in the cause, that they are entitled to a larger sum. The defendants insist that the judgment gives the plaintiffs too much. To authorize a reversal on their appeal they must convince us that less should have been allowed. The facts relied upon by the plaintiffs to show that the actual or market value of the stock in March 1837 was sufficient to entitle them to a larger sum than the amount of the judgment, are not, in our estimation, of such a character as will authorize us to decide that the court erred in not giving them enough. We think, however, the allowance is not more than they were entitled to under the facts disclosed in the statement.

The facts on which the defendants rely, for the purpose of showing that the court committed an error, by allowing too much, have not produced such a conviction upon our minds.

It is true the stock was sold as low as $5 per share, but these sales were long subsequent to March 1837, the time at which the value is to be ascertained. And between that date and the time of the five dollar sales, other sales, at a much larger price, were made.

A judgment below coming up by appeal is *prima facie* correct, and cannot be reversed by the appellate court unless they are convinced it is erroneous.

After a careful examination of the case we are not prepared to say we are satisfied that there is error in the present judgment, and therefore it must be affirmed.

*Judgment affirmed.*